## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into this 23rd day of November 2022, to be effective as of the date of execution by the Parties with an employment commencement date as of January 3, 2023 (the "Effective Date"), by and between BEST FOOT FORWARD CORP., a Missouri corporation ("Corporation") and DOUGLAS BASSO, DPM ("Physician"). Together, PHYSICIAN and CORPORATION may be referred to herein as the "Parties".

### WITNESSETH

WHEREAS, CORPORATION operates a podiatric practices located at 1455 US Highway 61 South, Suite A, Festus, MO, 63028; 8790 Watson Road, Suite 103, Crestwood, MO, 63119; and, 123 Rottingham Court, Edwardsville, IL, 62025 (the "Offices") and CORPORATION desires to employ PHYSICIAN on a full-time basis to provide professional podiatric medical services (the "Services") on behalf of CORPORATION at the Offices and at South City Hospital, and SSM St. Mary's Hospital (each a "Hospital" and collectively the "Hospitals"); and

WHEREAS PHYSICIAN is duly licensed to practice podiatric medicine in the State of Illinois and the State of Missouri and desires to provide the Services at the Office and at the Hospitals.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **EMPLOYMENT**. Effective January 3, 2023, CORPORATION hereby employs PHYSICIAN to devote PHYSICIAN's full-time best efforts and loyalty to practice podiatric medicine and provide the Services at the Office, the Hospitals, or at such other office or location(s) as determined by CORPORATION.  PHYSICIAN shall not render any professional podiatric medical services for any person, corporation, or entity other than CORPORATION, without the prior written consent of CORPORATION.

2. **PHYSICIAN OBLIGATIONS**. At all times while this Agreement is in effect on and after the Effective Date, PHYSICIAN shall perform and/or meet the following obligations and requirements:

    a. PHYSICIAN shall:  (i) hold an unrestricted license to practice podiatric medicine and prescribe medication (including controlled substances) in the State of Illinois and the State of Missouri; (ii) hold unrestricted clinical privileges at the Hospitals and such other facilities or entities as determined by CORPORATION that CORPORATION requires of its other Physicians from time to time; and (iii) maintain a valid and unrestricted license to practice podiatric medicine in each state in which he practices, including but not limited to Missouri and Illinois.

    b. PHYSICIAN shall comply with and perform all Services under this Agreement in accordance with: (i) the prevailing professional standards at the time such Services are rendered and the currently accepted methods and

    practices of the Illinois Department of Financial and Professional Regulation and the Missouri Division of Professional Regulation; (ii) the performance measures established from time to time by CORPORATION, which standards apply to all similarly situated podiatrists or physicians employed by or under contract with CORPORATION (collectively, "Physicians"); (iii) CORPORATION's bylaws, policies, and procedures, including but not limited to the CORPORATION's Code of Conduct; (iv) the Medical Staff bylaws, rules, regulations, policies and procedures of the Hospitals; and (v) the ethical standards of the American Podiatric Medical Association. Neither party shall engage in any conduct which jeopardizes the health or safety of CORPORATION's patients.

c. PHYSICIAN shall at all times be and remain a provider in good standing with Federal and State Reimbursement Programs. PHYSICIAN shall notify CORPORATION within five (5) days of the date that he becomes aware of any investigation or proceeding against PHYSICIAN which could result in PHYSICIAN's exclusion from such programs, and PHYSICIAN immediately will notify CORPORATION in the event of such suspension or exclusion.

d. PHYSICIAN shall participate and execute such agreements as are requested by CORPORATION to participate in the Medicare and state Medicaid programs (including participating status), and other third party or direct payor programs approved by CORPORATION, including without limitation, CORPORATION-approved HMOs, PPOs, EPOs, PHOs and other managed care programs. PHYSICIAN shall take all necessary action as directed by CORPORATION to meet eligibility and credentialing criteria of such programs.

e. PHYSICIAN shall work with the other Physicians providing Services to facilitate continuity of patient care and promote a harmonious work environment conducive to the provision of quality health care. PHYSICIAN agrees that the President of CORPORATION, or his designee, shall be the CORPORATION's liaison to the various Hospital administrative staffs for all non-quality of care issues involving CORPORATION. Assignment of regular on call responsibilities will include prior written agreement signed by both Parties. No regularly scheduled face to face patient care obligations on Saturday or Sunday.

f. PHYSICIAN shall prepare on a timely basis and maintain complete and accurate medical and other records with respect to the services and treatment rendered to any patient pursuant to this Agreement. PHYSICIAN shall complete all records in accordance with the standards established by CORPORATION. The ownership and right of control of all reports, records, medical records and supporting documents, including billing records, prepared in connection with the professional medical services provided by PHYSICIAN hereunder (collectively, "Records") shall rest

exclusively in CORPORATION. Upon the expiration or termination of this Agreement for any reason, PHYSICIAN shall promptly deliver to CORPORATION all such Records. CORPORATION shall grant PHYSICIAN reasonable access to the Records during business hours for any ongoing medical purposes and/or in order to defend against any professional liability claims or disciplinary actions. In the event PHYSICIAN requests a copy of any of the records, then PHYSICIAN shall be obligated to reimburse CORPORATION its actual costs to provide such requested copies. Upon the termination or expiration of this Agreement for any reason, any patient notification that CORPORATION may be legally obligated to send to patients whose treating physician is PHYSICIAN will be drafted by and with the mutual consent of CORPORATION and PHYSICIAN, and all reasonable costs incurred (other than attorney's fees) to prepare and mail such notifications shall be allocated in equal shares to and paid by CORPORATION and PHYSICIAN. The provisions of this Section 2(f) shall survive the expiration or termination of this Agreement for any reason.

g.  PHYSICIAN shall: (i) provide Services as required by CORPORATION and provide a reasonable amount of charity care, public aid and self-pay in a manner and at times as is reasonably determined by CORPORATION, provided that such Services are performed in substantially equal proportion among all of the physicians employed by CORPORATION; (ii) participate and represent CORPORATION in marketing, community service activities, speaker's bureau and outreach program; (iii) participate on CORPORATION committees, including committees comprised of other employed Physicians and/or podiatric or medical staff committees; and (iv) cooperate with, and participate in, quality audits, outcome studies, patient surveys and other similar mechanisms conducted by CORPORATION to measure the performance of PHYSICIAN hereunder as well as cooperate with CORPORATION in its development of quality measures against which CORPORATION may compare audit, study and survey results.

h.  PHYSICIAN shall not be employed by or perform professional services for any entity without CORPORATION's prior written permission.

i.  PHYSICIAN represents that he is not, and will not become, a party to any agreement that would or will be breached by the execution and performance of this Agreement.

3.  **PHYSICIAN'S OFFICE**. When PHYSICIAN is providing Services at the Office, CORPORATION shall provide office space, personnel, equipment, furnishings, fixtures and supplies as CORPORATION reasonably determines necessary for the proper operation and conduct of a physician practicing within PHYSICIAN's specialty.

4. **BILLING AND COLLECTION**.

   a. PHYSICIAN acknowledges and agrees that all fees, income, revenue or other compensation received, realized or derived by CORPORATION or PHYSICIAN which are attributable to the performance by PHYSICIAN of the Services while he is employed by CORPORATION are and shall be the sole and exclusive property of CORPORATION, including but not limited to fees, income, revenue or other compensation received by CORPORATION after termination of this Agreement for services performed by PHYSICIAN during this Agreement.

   b. PHYSICIAN acknowledges and agrees that CORPORATION will bill and collect, or will arrange for the billing and collection of, all fees attributable to the performance by PHYSICIAN of podiatric and other professional services while he is employed by CORPORATION and that PHYSICIAN shall not bill or collect from any patient or third party payor any amount for services rendered by him hereunder. PHYSICIAN irrevocably assigns to CORPORATION all of PHYSICIAN's rights to receive payment for podiatric medical and other professional services provided by PHYSICIAN hereunder. PHYSICIAN agrees to execute any and all documents and take any other actions deemed necessary or desirable by CORPORATION to carry out the provisions of this Section.

   c. PHYSICIAN acknowledges and agrees that CORPORATION or an entity with whom CORPORATION contracts will bill and collect all fees attributable to the performance by PHYSICIAN of podiatric medical and other professional services while PHYSICIAN is employed by CORPORATION, and that PHYSICIAN shall not bill or collect from any patient or third party payor any amount for services rendered by PHYSICIAN hereunder.  PHYSICIAN irrevocably assigns to CORPORATION all of PHYSICIAN's rights to receive payment for podiatric medical and other professional services provided by PHYSICIAN hereunder. PHYSICIAN agrees to execute any and all documents and take any other actions deemed necessary or desirable by CORPORATION to carry out the provisions of this Section.

5. **PRODUCTIVITY-BASED COMPENSATION**.

   a. Beginning on the Effective Date, PHYSICIAN shall receive monthly compensation equal to Forty Percent (40%) of all cash receipts received by CORPORATION and attributed to professional services rendered by PHYSICIAN to patients of CORPORATION at a clinic site owned and operated by the CORPORATION.  PHYSICIAN's entitlement to receipts will end as of the date 90 days after termination of this Agreement.

   b. In addition, PHYSICIAN shall receive monthly compensation equal to Fifty Percent (50%) of all cash receipts received by the CORPORATION and

  attributed to professional services rendered by PHYSICIAN to patients of the CORPORATION in non-CORPORATION-owned alternative health care settings, such as nursing homes, hospitals, hospital-based practice sites and wound care centers. PHYSICIAN's entitlement to receipts will end as of the date 90 days after termination of this Agreement.

c.  The foregoing compensation set forth in Sections a and b above shall be paid on a monthly basis, on the 15th day of the month, based on cash receipts received by the CORPORATION and attributed to professional services rendered by PHYSICIAN in the preceding months.

d.  Recognizing that accounts receivable for services generated in the first ninety (90) days may not be converted to cash for up to three months, the CORPORATION will provide the PHYSICIAN with a limited and recoverable draw. PHYSICIAN shall receive a monthly draw of Six Thousand Dollars ($6,000.00) only for the first consecutive six (6) months commencing on the Effective Date. Beginning on July 1, 2023, PHYSICIAN will not receive a draw. In the event payments to PHYSICIAN calculated in accordance with Sections a and b above, and attributed to professional services rendered by PHYSICIAN to patients of the CORPORATION in any of the first six (6) months exceed Six Thousand Dollars ($6,000.00), PHYSICIAN will be paid the difference. In the event the PHYSICIAN earns less than Six Thousand Dollars ($6,000.00) based on the formula set forth in Sections A and B above, the negative balance will be carried forward through the completion of the six (6) month draw period. At the conclusion of the six (6) month draw period, the total amount of the draws ($36,000.00) will be reconciled against PHYSICIAN's share of the productivity-based compensation set forth in Sections a and b above. To the extent the draws exceed the productivity-based compensation amount, that amount will be ascertained and subject to the retention bonus provisions of Section e below.

e.  In the event any amount of the draw payable over the first six (6) months exceeds the productivity formulae set forth in Sections a and b above, and provided the PHYSICIAN remains employed through the conclusion of the first year, the negative balance shall be forgiven as a retention bonus. In the event this Agreement is terminated prior to the conclusion of the first year for any reason other than a termination without cause by the CORPORATION, PHYSICIAN shall owe and shall repay within thirty (30) days of termination the amount of the negative balance.

f.  CORPORATION agrees to reimburse fifty percent (50%) of PHYSICIAN's health insurance premiums actually paid by PHYSICIAN for a mutually-agreed-on health insurance plan. At CORPORATION's request, PHYSICIAN shall provide copies of receipts showing PHYSICIAN's payment of insurance premiums for which reimbursement is sought. This benefit shall be re-evaluated on an annual basis. In the event

      CORPORATION chooses to terminate this benefit, CORPORATION shall give thirty (30) days' notice of the termination prior to the commencement of the calendar year.

   g. CORPORATION agrees to provide the PHYSICIAN with a Continuing Medical Education allowance comparable to the reasonable costs of attendance at meetings or courses agreed in advance by CORPORATION and the PHYSICIAN not to exceed Five Hundred and 00/100 Dollars ($500.00) per year. Company shall pay all fees relating to professional licenses, hospital and surgery center dues/registrations, professional society memberships, and Boards Maintenance.

   h. All compensation shall be subject to normal withholding for federal and state income taxes, and contributions for FICA and other required contributions and deductions.

  6. **VACATION**.  During each calendar year of employment, the PHYSICIAN shall be eligible to earn up to thirty (30) days of paid time off.  The annual accrual of paid time off will be earned ratably over the course of each calendar year, and in the event of a termination occurring during any calendar year, PHYSICIAN shall receive as part of final compensation only the prorated portion of earned but untaken vacation time.  If PHYSICIAN does not use all of his vacation time in any calendar year, he will be allowed to carry forward into the subsequent year up to a maximum of five (5) days of earned, but unused vacation time. All other time not used may not be carried over to the next year and will be lost.  In the event the PHYSICIAN wishes to take a paid vacation, but has not yet earned sufficient time for the length of vacation, the PHYSICIAN shall execute an Advance Vacation Repayment Agreement, which is set forth as Exhibit 1 to this Agreement.  As PHYSICIAN is paid on a productivity basis, for purposes of computing the value of earned but untaken vacation time at the time of termination, CORPORATION shall compute the average daily compensation received by PHYSICIAN over the twelve (12) months preceding the termination date based on the productivity formula set forth above in this Section 5. If PHYSICIAN has been employed for less than a year, CORPORATION shall compute the average daily compensation received by PHYSICIAN since the commencement of employment based on the productivity formula set forth above in this Section 5.  The average daily compensation shall be used to pay out the any earned but untaken vacation time.

  7. **INSURANCE**. During the Term, CORPORATION shall maintain, at CORPORATION's expense, such professional liability insurance coverage as CORPORATION shall deem appropriate, in minimum amounts of One Million Dollars ($1,000,000.00) per occurrence, and Three Million Dollars ($3,000,000.00) in the aggregate of all claims, covering the acts or omissions of PHYSICIAN in the normal course of PHYSICIAN's employment through commercial policies from an insurance company authorized to do business in the State of Illinois ("Insurance Coverage").  If CORPORATION is providing Insurance Coverage for PHYSICIAN on a claims made basis, and in the event this Agreement is terminated without cause by PHYSICIAN, or terminated by CORPORATION for cause attributable to PHYSICIAN, then PHYSICIAN is responsible for obtaining and paying for the cost of an unlimited reporting endorsement (also known as "tail coverage") with coverage limits equal to the limits described above, or an unlimited prior acts reporting endorsement under a professional liability insurance

policy that continues after the termination of this Agreement ("Continued Coverage"), as hereinafter provided and defined below. If the CORPORATION terminates this Agreement without cause attributable to the PHYSICIAN, then the CORPORATION shall be responsible for obtaining and paying for the cost of an unlimited reporting endorsement. Any unlimited reporting endorsement obtained and paid for either by PHYSICIAN or the CORPORATION shall be from an "A" Rated Insurance Company licensed in Illinois, effective from and after the date of expiration or termination, in a minimum amount equal to the amount then provided for PHYSICIAN by CORPORATION, protecting CORPORATION and PHYSICIAN from professional liability related to any activity or act that may have occurred during PHYSICIAN's employment with CORPORATION.  PHYSICIAN may obtain Continued Coverage through PHYSICIAN's procurement of subsequent policies which provide for a retroactive date of coverage equal to the retroactive date of the insurance policy in effect as of the Effective Date of this Agreement,.

8. **SHAREHOLDER STATUS**.  CORPORATION, at its sole discretion, may consider PHYSICIAN for shareholder status at the end of two (2) years from the Effective Date of this Agreement. .

9. **TERM AND TERMINATION**.

   a. This Agreement shall commence on the Effective Date and shall continue for a period of two (2) years (the "Initial Term"), subject to earlier termination as provided herein. This Agreement shall automatically renew for additional one (1) year periods (each a "Renewal Term") unless either party otherwise notifies the other party in writing sixty (60) days before expiration of the Initial Term or Renewal Term, subject to earlier termination as provided herein. Collectively, the Initial Term and any Renewal Terms are the "Term." After initial term, Agreement to INCREASE from 40% to 45% paid on gross collections in office based practice settings, and 50% to 60%  in non-CORPORATION operated sites.

   b. Notwithstanding anything herein to the contrary, CORPORATION may terminate this Agreement upon notice to PHYSICIAN stating the effective date of termination if any one (1) or more of the following events occur: (i) PHYSICIAN fails to obtain or maintain unrestricted membership on the Medical Staffs of and/or unrestricted admitting and clinical privileges at the Hospitals for which Physician is required to maintain privileges pursuant to this Agreement; (ii) PHYSICIAN fails to maintain an unrestricted license to practice podiatric medicine in the State of Illinois or the State of Missouri; (iii) PHYSICIAN fails to maintain all customary narcotics and controlled substances numbers and licenses as required by federal, state, or local laws and regulations; (iv) PHYSICIAN is suspended or excluded from any federal or state health care reimbursement program, or is sanctioned by any such program; (v) PHYSICIAN is debarred or suspended from federal procurement and non-procurement programs by the federal government; (vi) PHYSICIAN is suspended, terminated or excluded from any

commercial reimbursement program (a "Health Plan") for reasons relating to the quality of care rendered by PHYSICIAN; provided, however, that if PHYSICIAN appeals, or requests a hearing with respect to, the Health Plan's decision to suspend, terminate or exclude PHYSICIAN from participation pursuant to the Health Plan's appeal or hearing processes then PHYSICIAN shall not be deemed to have been suspended, terminated or excluded until after the Health Plan has made a final decision with respect to such suspension, termination or exclusion as a result of such appeal or hearing; (vii) PHYSICIAN commits an act of grave misconduct, gross incompetence or gross misfeasance or commits a material violation of the professional canons of ethics; (viii) PHYSICIAN is convicted of, or pleads guilty to, a felony or a crime involving fraud or moral turpitude; (ix) PHYSICIAN ceases to be engaged in the practice of medicine on a full-time and exclusive basis on behalf of CORPORATION; (x) PHYSICIAN engages in any conduct that is unethical, unprofessional, jeopardizes or threatens to jeopardize the health or safety of patients or is disruptive to the operation or interests of CORPORATION or the Office; (xi) PHYSICIAN fails to provide care that meets applicable community standards of appropriate podiatric medical practice; (xii) PHYSICIAN is verbally abusive or otherwise interferes with a harmonious work environment.

c. Either party may terminate this Agreement immediately upon notice if the other party, by act or failure to act, is in breach of a material term or condition of this Agreement, and fails to cure such breach on or before the expiration of a thirty (30) day written notice and cure period (the "Cure Period"); provided, however, CORPORATION shall have the right to immediately terminate this Agreement upon the occurrence of any of the events set forth in Section 9(b) above. Notwithstanding the foregoing, if the breach is cured within the Cure Period but the breaching party commits the same or a substantially similar breach within a six (6) month period following the expiration of the Cure Period, then the non-breaching party may immediately terminate this Agreement without any further Cure Period being afforded.

d. This Agreement shall automatically terminate if PHYSICIAN dies or, subject to compliance with the Americans with Disabilities Act and the family and Medical Leave Act (to the extent applicable), is unable to perform his duties hereunder for one hundred twenty (120) continuous days due to a disability. The Company shall have the right to terminate the Employee's employment pursuant to this Agreement immediately if the Employee becomes permanently and totally disabled or incapacitated within the meaning of §475.010 R.S.Mo.

e. Upon any termination and effective 90 days after the termination date, any receivables attributable to services PHYSICIAN provided, or future account receivables for unbilled services performed by PHYSICIAN shall be the property of the CORPORATION.

10. **INDEMNIFICATION**. PHYSICIAN shall indemnify, defend and hold harmless CORPORATION, its successors and assigns from and against any and all losses, claims, damages, liabilities and expenses (including reasonable attorneys' fees) (the "Losses") sustained or incurred by CORPORATION as a result of PHYSICIAN's acts or omissions where PHYSICIAN did not act in good faith or where PHYSICIAN is adjudged to be liable for negligence or recklessness or intentional misconduct in the performance of PHYSICIAN's duties under this Agreement; provided, however, that to the extent that CORPORATION is compensated or reimbursed for any such Losses from insurance purchased by CORPORATION or the PHYSICIAN, PHYSICIAN shall not be required to reimburse CORPORATION for such Losses, i.e., CORPORATION cannot recover twice.

11. **AUTHORIZATION FOR RELEASE OF INFORMATION**. PHYSICIAN expressly authorizes any third party, including, but not limited to, any hospital, health care provider, managed care company, individual person, government agency, corporation or other legal person (collectively "Institution(s)"), to notify CORPORATION of any final action adversely affecting PHYSICIAN's staff or clinical privileges at, or participating or certified provider status with, any such Institutions. PHYSICIAN expressly releases and holds CORPORATION and any Institution (and the respective officers, directors, PHYSICIANs and agents of CORPORATION or any such Institution) providing information to CORPORATION or receiving or acting upon information received pursuant to this Section 11, harmless from any liability arising from such disclosures, provided that such disclosures are truthful and made in good faith. This authorization shall commence on the Effective Date, and shall continue until the expiration or termination of this Agreement for any reason; provided, however, that the release of liability set forth herein shall survive the expiration or termination of this Agreement for any reason, and communications made after the date of expiration or termination regarding matters which occurred prior to such expiration or termination shall be considered within the scope of this authorization.

12. **NONCOMPETITION**.  For and in consideration for employment, PHYSICIAN further agrees as follows:

    a. For a period of one (1) year after the termination of this Agreement for any reason, PHYSICIAN shall not, directly or indirectly, individually or as an officer, director, shareholder, employee, consultant or agent of any corporation, partnership or firm, association, or other corporation engage in podiatric medical practice or provide such medical services at any location within a eight (8) mile radius of any Hospital or Office at which PHYSICIAN provided services on behalf of CORPORATION, where PHYSICIAN provided at least 100 hours of service over the 12 months prior to termination, nor during the Term and for a period one (1) year after expiration or termination, may PHYSICIAN enter into either an employment relationship or independent contractor relationship to provide podiatric medical services, including administrative services for any hospital or health care system at a site within eight (8) miles of any Hospital or Office at which PHYSICIAN provided services on behalf of CORPORATION, where PHYSICIAN provided at least 100 hours of service over the 12 months prior to termination.

b.  For a period of one (1) year after the termination of this Agreement for any reason, PHYSICIAN shall not, directly or indirectly, individually or as an officer, director, shareholder, employer, consultant or agent of any corporation, partnership or firm, association, or other corporation, provide podiatric medical services to any patient of Corporation or solicit any such patient to provide such services, or solicit or induce such patients to limit or terminate their professional relationship with CORPORATION.  For purposes of this sub-section (b), a patient of the CORPORATION shall be defined as any patient seen by PHYSICIAN during his employment, or any patient to whom services were provided at any time prior to the termination of this Agreement.

c.  PHYSICIAN shall not, directly or indirectly, in any manner, disclose or divulge to any third party, or use for his/her own benefit or for the benefit of any third person, confidential information of CORPORATION, including, but not limited to, CORPORATION's confidential methods of operation, pricing policies, marketing strategies, trade secrets, knowledge, techniques, data and other information about CORPORATION's operations and business of a confidential nature (collectively, the "Confidential Information"), unless CORPORATION consents in writing to the disclosure or use, or unless PHYSICIAN is under a clear duty to make such disclosure or use and CORPORATION informs PHYSICIAN of such duty prior to any disclosure or use.

d.  PHYSICIAN acknowledges that the restrictions set forth this Sections 12(a), (b), and are reasonable in scope and essential to CORPORATION's legitimate business interests and that the enforcement thereof will not in any manner preclude PHYSICIAN from becoming gainfully employed in such manner and to such extent as to provide a standard of living for PHYSICIAN, the members of PHYSICIAN's family, and those dependent upon PHYSICIAN of at least the sort and fashion to which PHYSICIAN and they have become accustomed and may expect.

e.  PHYSICIAN further acknowledges that a breach of the covenants contained in this Section 12 will have an irreparable, material and adverse effect upon CORPORATION and that damages arising from any such breach may be difficult to ascertain. Without limiting any other remedy at law or equity available CORPORATION, in the event of a breach of the covenants contained in this Section 12, CORPORATION shall each have the right, without the requirement of a bond, to an immediate injunction enjoining PHYSICIAN's breach of the covenants contained in this Section 12. In the event that any litigation or judicial proceeding is necessary to enforce the provisions of this Section 12, and CORPORATION is the prevailing party in such a proceeding, then CORPORATION shall have the right to receive from PHYSICIAN its attorneys' fees, costs and expenses. In the event a court of competent jurisdiction determines that the foregoing non-compete, non-solicitation or trade secret provisions are unreasonable in either

      geographic scope, time or both, the provisions will not fail, but rather will be subject to amendment which shall be judicially determined. Every right and remedy of CORPORATION shall be cumulative and CORPORATION, in its sole discretion, may exercise any and all rights or remedies stated in this Agreement or otherwise available at law or in equity.

f.    PHYSICIAN represents and acknowledges that CORPORATION has advised PHYSICIAN to consult with an independent attorney before entering into the non-compete and non-solicitation covenants contained in this Agreement. PHYSICIAN represents and acknowledges that PHYSICIAN had a reasonable and adequate opportunity to consult with counsel of PHYSICIAN's choice prior to signing this Agreement. PHYSICIAN represents and acknowledges that he was provided a copy of this Agreement at least fourteen (14) calendar days before the Effective Date or with at least fourteen (14) calendar days to review it. PHYSICIAN represents and acknowledges that CORPORATION has provided him with adequate consideration for entering into the non-compete and non-solicitation covenants that are included herein, including specifically the cash consideration dedicated to this covenant. PHYSICIAN represents and acknowledges that the scope of the non-compete and non-solicitation covenants herein are no greater than is required for the legitimate business protection of the CORPORATION; that the covenants do not and will not impose an undue hardship on PHYSICIAN; and the covenants are not injurious to the public.

g.    This Agreement may be immediately terminated by PHYSICIAN, after written notice and thirty (30) days' opportunity for the CORPORATION to cure, upon the occurrence or omission by the CORPORATION of any one or more of the following: (i) CORPORATION'S failure to make an uncontested material payment of compensation or benefits due PHYSICIAN; (ii) the CORPORATION'S breach of the terms or provisions of this Agreement; or (iii) CORPORATION's dissolution or insolvency, whether voluntary or involuntary.

13. **MISCELLANEOUS**.

    a.    This Agreement constitutes the entire agreement between CORPORATION and PHYSICIAN and supersedes all prior proposals, negotiations, representations, communications, writings and agreements between CORPORATION and PHYSICIAN with respect to the subject matter hereof, whether oral or written. This Agreement may only be amended or modified by a subsequent written agreement between duly authorized representatives of CORPORATION and PHYSICIAN. This Agreement shall be binding on the parties, their successors, and permitted assigns.

    b.    This Agreement may be signed by the parties in two counterparts, both of which shall be considered one and the same agreement, binding on the

        parties, notwithstanding that both parties are not signatories to the same counterpart. All documents delivered by facsimile shall be binding as though originals thereof had been delivered.

c.     In the event that any sections, paragraphs, sentences, clauses or phrases of this Agreement (individually, "Provision") shall be found invalid, void and/or unenforceable, for any reason, neither this Agreement generally nor the remainder of this Agreement shall thereby be rendered invalid, void and/or unenforceable, but instead each such Provision and (if necessary) other Provisions hereof, shall be reformed by a court of competent jurisdiction so as to effect, insofar as is practicable, the intention of the parties as set forth in this Agreement, and this Agreement shall then be enforced as so reformed. Notwithstanding the preceding sentence, if such court is unable or unwilling to effect such reformation, the remainder of this Agreement shall be construed and given effect as if such invalid, void and/or unenforceable Provision(s) had not been a part hereof,

d.     The failure of CORPORATION or PHYSICIAN to object to or take affirmative action with respect to any conduct of the other which is in violation of the provisions of this Agreement shall not be construed as a waiver of that violation or of any future violations of the provisions of this Agreement.

e.     Any notices or other communications required or contemplated under the provisions of this Agreement shall be in writing and delivered in person, evidenced by a signed receipt, or mailed by certified mail, return receipt requested, postage prepaid, to the addresses indicated below or to such other persons or addresses as CORPORATION or PHYSICIAN may provide by notice to the other. The date of the notice shall be the date of delivery if the notice is personally delivered, or the date of mailing if the notice is mailed by certified mail.

| If to CORPORATION: | If to PHYSICIAN: |
|---|---|
| 1455 US Highway 61 Ste A<br>Festus, MO 63028 | 4105 Endicott Court<br>Swansea, IL 62226 |

f.     PHYSICIAN may neither assign his rights or obligations under this Agreement nor otherwise subcontract for, or delegate, the performance of his obligations under this Agreement to any other person or entity. CORPORATION, without the prior consent of PHYSICIAN, may assign CORPORATION rights and obligations under this Agreement to another legal entity owned or controlled by, under common control or affiliated with, CORPORATION or the successor in interest of CORPORATION, whether through an Asset Purchase Agreement or Stock Purchase Agreement.

g.     This Agreement shall be construed and enforced in accordance with the substantive laws of the State of Missouri, without regard to conflict of laws' provisions.

h.     All parties to this Agreement shall comply with all applicable federal, state and local laws and regulations regarding confidentiality of patient records, including, but not limited to, the Health insurance Portability and Accountability Act of 1996 ("HIPAA") and the Privacy Standards (45 C.F.R. Parts 160 and 164), the Standards for Electronic Transactions (45 C.F.R.. Parts 160 and 162) and the Security Standards (45 C.F.R. Parts 160, 162 and 164) (collectively, the "Standards") promulgated or to be promulgated by the Secretary of Health and Human Services on and after the applicable effective dates specified in the Standards, and shall not be released, disclosed, or published to any party other than as required or permitted under applicable laws. PHYSICIAN agrees to abide by the obligations to protect CORPORATION's confidential trade secrets pursuant to R.S.Mo. Section 417.450, et seq.

i.     PHYSICIAN represents and warrants to CORPORATION that PHYSICIAN is not suspended or excluded from participation in any federal health care programs, as defined under 42 U.S.C. § 1320a-7b(f), or any form of state Medicaid program, and to PHYSICIAN's knowledge, there are no pending or threatened governmental investigations that may lead to such suspension or exclusion. PHYSICIAN agrees to notify CORPORATION of the commencement of any such suspension or exclusion or investigation within three (3) days of PHYSICIAN's first learning of it and CORPORATION shall have the right to terminate this Agreement after 90 days of learning of any suspension or exclusion, or if in its sole discretion, CORPORATION believes that such investigation may lead to an uncurable suspension or exclusion, PHYSICIAN further represents and warrants that by entering into this Agreement he is not knowingly in violation of any restrictive covenant to which he may have been bound by any previous employer or contracting entity.

j.     The headings of Sections in this Agreement are for reference only and shall not affect the meaning of this Agreement.

k.     Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies on any persons other than the parties to it and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, or to give any third persons any right of subrogation or action against any party to this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed this EMPLOYMENT AGREEMENT as of the date and year first above written.

DOUGLAS BASSO, DPM                                    BEST FOOT FORWARD CORP.

_____                         By:_____
                                                      Name: Franklin W. Harry, DPM
                                                      Title: Founder & President

14

## ADVANCED VACATION REPAYMENT AGREEMENT

      I acknowledge I have not earned sufficient vacation time for BEST FOOT FORWARD CORP. to continue my regular compensation during my requested time off.  In consideration for the agreement by BEST FOOT FORWARD CORP. to allow me to take time off, which is currently scheduled to commence on _____,  2022, and terminate on _____, 2022, and to continue my regular compensation during that time, _____ may deduct any unearned but taken vacation compensation from my final compensation which is otherwise payable to me upon termination.  I acknowledge that this agreement is entered into freely by me in order to allow me to receive an employment benefit to which I am not currently entitled.  BEST FOOT FORWARD CORP. is authorized to make the appropriate deduction upon my termination from employment without any requirement for further approval from me, and this agreement is in accordance with Section 300.760 of the Regulations of the Illinois Department of Labor.

                                                                                   DOUGLAS BASSO, DPM

Date:_____

**EXHIBIT 1**

1050219\312053314.v1