# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| **BEST FOOT FORWARD CORPORATION,** | ) |
| **Plaintiff,** | ) |
| v. | ) Case No. 4:23CV1246 HEA |
| **DOUGLAS K. BASSO, et al.,** | ) |
| **Defendants** | ) |

## OPINION, MEMORANDUM AND ORDER

Plaintiff's Motion for Temporary Restraining Order, [Doc. No. 4] is now before the Court for consideration. Defendants have filed their response in opposition to the Motion.  On October 16, 2023, the parties appeared in person for a hearing. The Court has reviewed the pleadings, exhibits, and memoranda of law submitted by the respective parties, and has considered the arguments presented at the hearing. For the reasons set forth below, the Court concludes that a Temporary Restraining Order is not warranted, and the motion will be denied.

### Facts and Background[1]

On November 23, 2022, Plaintiff, ("BFF"), entered into an Employment Agreement with Basso ("Employment Agreement"). On September 16, 2023,

---

[1] The Court draws the facts in this section from Plaintiff's Complaint, Plaintiff's Memorandum in support of the instant motion, and Defendants' Response.

Basso informed BFF that he was terminating his employment by BFF, with a proposed effective date of October 15, 2023.

Prior to entering into the Employment Agreement with BFF, Basso had formed Basso Family LLC on April 22, 2022, for the purpose of his practice of podiatry in the Kansas City, Missouri area. Unbeknownst to BFF, approximately four (4) months prior to Basso giving his notice to BFF of his intent to terminate his employment by BFF, Basso changed the registered agent and office for Basso Family LLC to himself at 2821 North Ballas Road, Suite C15, St. Louis, Missouri 63131, which BFF learned is where Basso intends to operate his own podiatric practice.

BFF was also informed that Defendant Erickson, an employee of BFF was also going to be leaving the employment of BFF to work for Basso in his new practice.

BFF avers that on September 18, 2023, it became aware that Basso and Aubree Basso were contacting BFF's patients and soliciting them to leave BFF and follow Basso to a new practice Basso was establishing.

BFF further avers it has acquired information that Erickson was purposely delaying obtaining authorizations for surgeries Basso was to conduct on BFF patients until Basso left BFF's employ so that the authorizations could be secured

2

under Basso Family LLC and the proceeds from which would be retained by Basso Family LLC and Basso.

BFF terminated Basso and Erickson's employment on September 19, 2023. Upon the termination of Basso and Erickson, both were to leave the BFF premises immediately and leave all BFF property as well. They were told that all of their personal property would be gathered and returned to them. BFF claims Basso took a laptop owned by BFF, which BFF believed was for the purpose of accessing and taking confidential and proprietary BFF information, including patient lists, and other such information. Further, after both Basso and Erickson were terminated, BFF claims it obtained information that they both tried to access one of BFF's offices to retrieve personal property.

BFF avers it has confirmed multiple instances of wrongful solicitations of BFF's patients.

Basso's Employment Agreement contains an express non-compete restriction ("CNC") at §12 thereof. It states in pertinent part:

> a. For a period of one (1) year after the termination of this Agreement for any
> reason, PHYSICIAN shall not, directly or indirectly, individually or as an officer, director, shareholder, employee, consultant or agent of any corporation, partnership or firm, association, or other corporation engage in podiatric medical practice or provide such medical services at any location within a eight (8) mile radius of any Hospital or Office at which PHYSICIAN provided services on behalf of CORPORATION, where PHYSICIAN provided at least 100 hours of service over the 12 months prior to termination, nor during the Term and for a period one (1) year after

3

expiration or termination, may PHYSICIAN enter into either an employment relationship or independent contractor relationship to provide podiatric medical services, including administrative services for any hospital or health care system at a site within eight (8) miles of any Hospital or Office at which PHYSICIAN provided services on behalf of CORPORATION, where PHYSICIAN provided at least 100 hours of service over the 12 months prior to termination.
b. For a period of one (1) year after the termination of this Agreement for any
reason, PHYSICIAN shall not, directly or indirectly, individually or as an officer, director, shareholder, employer, consultant or agent of any corporation, partnership or firm, association, or other corporation, provide podiatric medical services to any patient of Corporation or solicit any such patient to provide such services, or solicit or induce such patients to limit or terminate their professional relationship with CORPORATION. For purposes of this sub-section (b), a patient of the CORPORATION shall be defined as any patient seen by PHYSICIAN during his employment, or any patient to whom services were provided at any time prior to the termination of this Agreement.
c. PHYSICIAN shall not, directly or indirectly, in any manner, disclose or divulge to any third party, or use for his/her own benefit or for the benefit of any third person, confidential information of CORPORATION, including, but not limited to, CORPORATION's confidential methods of operation, pricing policies, marketing strategies, trade secrets, knowledge, techniques, data and other information about CORPORATION's operations and business of a confidential nature (collectively, the "Confidential Information"), unless CORPORATION consents in writing to the disclosure or use, or unless PHYSICIAN is under a clear duty to make such disclosure or use and CORPORATION informs PHYSICIAN of such duty prior to any disclosure or use.

The location of Basso Family LLC is within eight (8) miles of BFF's office

located at 8790 Watson Road, Suite 103, St. Louis, Missouri 63119.

While employed by BFF, Basso provided podiatric medical services on

behalf of BFF at the following hospitals: St. Joseph's Hospital Highland (12866

4

Troxler Ave., Highland, Illinois 62249) and Twin Cities Surgery Center (1101 W. Gannon Drive, Festus, Missouri 63028).

The CNC also provides Basso is prohibited for a period of one (1) year after the termination of his employment from providing podiatric services to any BFF patient, or from soliciting any such patient to limit or terminate their relationship with BFF.  The CNC also provides, Basso is prohibited from taking and/or using BFF's confidential and proprietary information, trade secrets, means and methods. At the hearing, the parties argued in support of their respective positions.

## Legal Standard

The standard for issuance of the "extraordinary and drastic remedy" of a temporary restraining order or a preliminary injunction is very high, *see Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), and by now very well established. Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant, (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant, (3) the probability that movant will succeed on the merits, and (4) the public interest." *Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981). The same factors govern a request for a temporary restraining order. *Roberts v. Davis*, 2011 WL 6217937, at *1 (E.D. Mo. Dec. 14, 2011). None of the four factors "is determinative," and each must be examined "in the context of the relative

5

injuries to the parties and the public." *Dataphase*, 640 F.2d at 113. "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id*. The inquiry is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys.*, 640 F.2d at 113.

Defendant Ericson has consented to the entry of a temporary restraining order on October 16, 2023.

Since Defendant Aubree Basso is not subject to the employment agreement, Plaintiff cannot satisfy any of the factors necessary for entry of a temporary restraining order with respect to Aubree Basso.

**Likelihood of Success on the Merits**

The likelihood of success is the most important factor. *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). This factor directs courts to ask whether the party requesting a temporary restraining order has a "fair chance of prevailing." *Planned Parenthood Minn., N. Dak., S. Dak. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). The moving party bears the burden to establish the need for injunctive relief. *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 914 (8th Cir. 2015).

6

To demonstrate a likelihood of success on the merits, a movant need not show that it will ultimately succeed on its claims; rather, it must show that its prospect for success is sufficiently likely to support the kind of relief it requests. *Noodles Dev., LP v. Ninth St. Partners, LLP*, 507 F. Supp. 2d 1030, 1034 (E.D. Mo. 2007) (citing *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 488 (8th Cir. 1993)). That is, a movant need only show that it has a "fair chance of prevailing." *Planned Parenthood Minn.*, 530 F.3d at 732–33.

In response to Plaintiff's motion for a TRO, Defendant Douglas Basso has submitted his declaration wherein Defendant urges Plaintiff has breached the employment contract at issue, and therefore he is no longer bound by the terms of the CNC. In support of his position, Defendant declares Plaintiff has failed to provide him with the equipment he needed to treat his patients, he was untimely paid on several occasions, Plaintiff's records indicated that services he performed were performed by another provider, which reduced his compensation, he was asked to perform services for patients without fee or waiving certain charges, expired medications were set out for use by providers to use.

If an employer's actions constitute breach of the employment contract, the employer is barred from seeking enforcement of a non-compete against a former employee. *McKnight v. Midwest Eye Inst. of Kansas City Inc.*, 799 S.W.2d 909 (Mo. App. W.D. 1990) (employer barred from enforcing covenant with

7

ophthalmologist after terminating his on-call duties, canceling his surgeries, and locking his office 1 month prior to expiration of contract, thus preventing him from earning any sum in excess of his base salary). "It is a duty of one party to a contract to cooperate with the other to enable performance and achievement of the expected benefits." *Id*. at 914. Here, Plaintiff failed to timely pay Defendant, failed to provide him with the equipment to treat patients, asked Plaintiff to not bill for certain services, or waive charges, listed services provided by Defendant as having been performed by someone else, thereby depriving Defendant of a valuable compensation. Based on these facts, Plaintiff's arguable breach of contract by depriving Defendant of the opportunity to earn significant compensation may render the restrictive covenants unenforceable.

A claim for misappropriation of trade secrets under the MUTSA has three elements: (1) the existence of protectable trade secrets, (2) misappropriation of the trade secrets by the defendant, and (3) damages or entitlement to injunctive relief. *Secure Energy, Inc. v. Coal Synthetics, LLC*, 708 F. Supp. 2d 923, 926 (E.D. Mo. 2010); *Cent. Tr. & Inv. Co. v. Signalpoint Asset Mgmt., LLC*, 422 S.W.3d 312, 320 (Mo. 2014) (en banc). Missouri law defines a trade secret as:

> information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process, that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its

disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mo. Rev. Stat. § 417.453(4).

Misappropriation is defined as:

> (a) Acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (b) Disclosure or use of a trade secret of a person without express or implied consent by another person who:
>
> a. Used improper means to acquire knowledge of the trade secret; or
>
> b. Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake; or
> c. At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
>
> i. Derived from or through a person who had utilized improper means to acquire it;
>
> ii. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> iii. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Mo. Rev. Stat. § 417.453(2). *See also Secure Energy, Inc.*, 708 F. Supp. 2d at 926.

Defendant had knowledge of Plaintiff's confidential information, *i.e.*. Plaintiff's patient information. But under the MUTSA, Plaintiff must show that Defendant Douglas misappropriated that information. At this point in the litigation, Plaintiff has made no such showing. Plaintiff simply asserts that Defendant

9

Douglas Basso had one of Plaintiff's laptops which Plaintiff contends contained the patient information. Defendant has submitted his declaration wherein he unequivocally declares the laptop had no patient information on it.

Plaintiff also urges that Defendant intends to or will inevitably utilize confidential information and/or trade secrets in providing podiatric treatment in his newly established practice. Courts refer to this future-misappropriation theory as the "inevitable-disclosure doctrine" and repeatedly emphasize that it poses a high bar. *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 969 (D. Minn. 2018) (citations omitted). Courts that have applied the doctrine consider several factors in determining whether misappropriation is inevitable, including: (1) the degree of competition between the plaintiff and a defendant's new employer, (2) the extent to which the defendant's new position is similar to the position he held with the plaintiff, and (3) the actions the plaintiff has taken to prevent the defendant from using or disclosing the plaintiff's trade secrets. *Id.* (citations omitted).

Missouri courts have neither accepted nor rejected the inevitable-disclosure doctrine. *See* Randall E. Kahnke, et al., *Doctrine of Inevitable Disclosure*, https://ipo.org/wp-content/uploads/2013/04/DoctrineofInevitableDisclosure.pdf (Sept. 2008); *see also Bus. Mach. Corp. v. Seagate Tech., Inc.*, 941 F. Supp. 98, 101 n.1 (D. Minn. 1992) ("The Eighth Circuit has neither accepted nor rejected the 'inevitable disclosure' doctrine."). In the absence of controlling authority, the

10

Court will decline to apply the doctrine in this case. *See Conseco Fin. Servicing Corp. v. N. Am. Mortg.*, No. 00CV1776, 2000 WL 33739340, at *12 (E.D. Mo. Dec. 6, 2000), *aff'd sub nom. Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co.*, 24 F. App'x 655 (8th Cir. 2002) (declining to apply the inevitable-disclosure doctrine absent controlling authority from the Eighth Circuit).

**Irreparable Harm**

"Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citation omitted). Plaintiff must show that the harm is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Gen. Motors Corp.*, 563 F.3d at 319 (citing *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)). Speculative harm does not support a preliminary injunction. *MPAY Inc.*, 970 F.3d at 1020.

There is no evidence in the record that Plaintiff has suffered irreparable harm or that such harm is certain and imminent. At this stage, all of Plaintiff's claims are based on speculative future harm. Plaintiff submits evidence that Aubree Basso has contacted some of its patients, not Douglas, who was subject to the noncompete agreement. Aubree apparently has no relationship with Plaintiff such that she would be bound by the terms of the agreement. Thus, even if Plaintiff

could establish a sufficient prospect for success on any of its claims, a preliminary injunction would be inappropriate. This factor weighs in Defendants' favor.

**The Balance of Harms**

"The balance of harms analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public." *Noodles Dev.,* 507 F. Supp. 2d at 1038 (cleaned up). An illusory harm to the movant will not outweigh any actual harm to the non-movant. *Id.* (citing *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir. 1992)).

The Court previously discussed the CNC and how it may no longer apply because of the asserted breach by Plaintiff. The Court now finds that this factor weighs in Defendants' favor. While the Covenant remains narrow in temporal and geographic scope, there are substantial questions surrounding its enforceability.

**Public Interest**

Finally, the evidence before the Court fails to establish that a TRO is necessary to protect the public interest. As explained herein, the enforceability of the CNC is now questionable. And while the public also has an interest in protecting trade secrets (*see Conseco Fin. Servicing Corp. v. N. Am. Mortg.*, 2000 WL 33739340, at *12), there is insufficient evidence in the record to show that defendants have appropriated Plaintiff's confidential information through the

12

manner Plaintiff's verified complaint claims. This factor weighs in neither party's favor.

## Conclusion

Having thoroughly reviewed the record in this case, including pleadings, exhibits, deposition testimony, and evidence presented at the hearing, the Court concludes that the balance of equities does not favor the entry of a TRO. The Court has carefully considered the four *Dataphase* factors and finds Plaintiff has not established that it is likely to prevail on any of its claims or that there is a significant threat of irreparable harm to Plaintiff absent an injunction. *Dataphase Sys.*, 640 F.2d at 113.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Injunction, [Doc. No. 4], is denied.

Dated this 30th day of October 2023.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE